[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-12061
_____

D.C. Docket No. 5:15-cv-00253-VEH


SURESHBHAI PATEL,

Plaintiff - Appellee,

versus


CITY OF MADISON, ALABAMA,
ERIC PARKER,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Northern District of Alabama
_____

(May 27, 2020)

Before ROSENBAUM, BRANCH, and HIGGINBOTHAM,[*] Circuit Judges.

ROSENBAUM, Circuit Judge:

It's long been said that a picture is worth a thousand words. Of course, people might reasonably differ on what those words are.[1] That's the problem here.

In this case, the video recordings from two police dashboard cameras are unable to definitively resolve the parties' dispute about whether Plaintiff-Appellee Sureshbhai Patel resisted Defendant-Appellant Officer Eric Parker's efforts to secure and frisk him. Parker contends Patel's alleged resistance prompted Parker to sweep Patel's legs out from under him and throw him to the ground, ultimately permanently partially paralyzing him. For his part, Patel insists that he never resisted Parker, and Parker's actions violated the Fourth Amendment's prohibition of excessive force.

Because neither the Court nor the video recordings can resolve these diametrically opposed accounts of what happened, the district court correctly concluded that summary judgment was not appropriate. So for the reasons set forth below, we affirm the district court's order.

---

[*] Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit, sitting by designation.

[1] An example of this phenomenon is "The Dress," a photograph that became a viral internet sensation when viewers were split between whether the dress was blue and black or white and gold. See, e.g., Jonathan Mahler, *The White and Gold (No, Blue and Black!) Dress That Melted the Internet*, N.Y. Times, Feb. 27, 2015, available at https://www.nytimes.com/2015/02/28/business/a-simple-question-about-a-dress-and-the-world-weighs-in.html.

## I.

## A.

On the morning of February 6, 2015, Jacob Maples thought he spotted an unfamiliar man roaming his street—Hardiman Place Lane—and possibly casing houses. So Maples phoned the Police Department at Defendant-Appellant City of Madison, Alabama (the "City"). He gave the dispatcher his name, address, and phone number and said he saw a skinny black man wearing a white or light-colored sweater, jeans, and a toboggan hat,[2] in the driveway at 148 Hardiman Place Lane. Maples also advised the dispatcher that the man was "walking around close to the garage." Then Maples asked the dispatcher to send "somebody to talk to [the unidentified man]."

The dispatcher issued a "check subject call" with the man's description and advised that the man was headed north on Hardiman Place. As part of the announcement, the dispatcher also said the man was "walking in the yards, standing by the driveways, and looking around the garages."

As it happened, Madison Officer Eric Parker was training Officer Andrew Slaughter in the vicinity of Hardiman Place Lane that day. When the dispatcher's "check subject" call came over the radio, the two officers headed over to Hardiman

---

[2] A toboggan hat is usually a knit-type beanie, often worn to keep the head warm in cooler weather. *See* https://letterpile.com/humor/Whether-You-Ride-or-Wear-A-Toboggan-Depends-on-Where-Youre-From (last visited May 26, 2020).

3

Place Lane to investigate. From his experience and training, Parker thought Hardiman Place Lane was a high-crime area and, more generally, he knew that burglars sometimes commit their crimes in the mid-morning after most people have left for work.

Meanwhile, Patel was going about his business, enjoying the cooler weather with a morning walk around the Hardiman Place Lane neighborhood. Patel had recently moved to his son's house at 148 Hardiman Place Lane after retiring from farming in his native Gujarati, India. Then 57 years old, Patel had emigrated to Madison about a week earlier to help raise his grandchildren. He spoke almost no English, having been raised in an area of India that primarily spoke Gujarati.

While Patel was on his walk, Parker and Slaughter arrived at Hardiman Place Lane and spotted Patel on the sidewalk. They thought Patel mostly matched the description Maples had provided, since Patel was wearing a white sweater, jeans, and a toboggan hat. And he was skinny like Maples said, weighing only 115 pounds. Two differences, of course, were that Patel was neither black nor in his thirties, but instead, was a 57-year old Indian grandfather. Parker decided to investigate.

Parker and Slaughter pulled their cruiser up behind Patel. Slaughter switched on the cruiser's dashboard camera, so the system began recording audio and video. The recording from that camera shows the following events.

4

Parker and Slaughter got out of their cruiser and approached Patel from behind.  Slaughter said, "Hi, Bud."

Patel briefly looked back at them and waved.  Then he continued walking.

Slaughter followed up, calling after Patel, "Let me talk to you real quick. Come here," and "What's going on, Sir?"

In response, Patel waved and walked towards the officers, whom he recognized as officers from the way they were dressed.  As he walked, Patel said to Parker and Slaughter, "India" and "no English."

Then Patel took two steps away from the officers, and again, Slaughter said, "Come here."  Once again, Patel answered, "India" and "no English."

Slaughter responded, "India . . . you're doing what?  Where are you heading?" Patel answered, "My house, my house, 148, walking, India," and pointed off in the direction that he was headed.

Patel then walked about seven steps away from the officers, towards his residence.  Slaughter told Patel to stop and said, "I can't understand you, Sir.  Where is your address? Where do you live? . . . Stop walking. Stop walking."  The officers walked the seven steps to reach Patel and asked him for his identification.  Patel again responded with "no English" and "India."  Parker repeated Patel's statement, "No English."

5

Then Slaughter asked Patel whether he lived in the neighborhood, what his address was, and where he was going.  Patel answered Slaughter's question about where he was going by pointing off towards his son's house again, and he took approximately nine more steps that way.  During the encounter, when Patel's hands are visible on the video recording, they can be seen moving at his midsection and by his sides.  Parker, though, later said Patel "kept reaching in his pockets" during their interaction.

At this point of the incident, Parker and Slaughter closed the nine steps between themselves and Patel.  Parker took over the encounter and said, "Sir, Sir, come here."  Patel stopped and turned towards the officers.  Then Parker took ahold of Patel's hands and held them behind Patel's back, knuckles to knuckles.  With Patel's hands secure, Parker began to frisk Patel's right pocket with his left hand while holding onto Patel's index fingers with his right.

Around this time, Officer Spence pulled up to the scene in his cruiser.  He parked his car facing Parker's vehicle, so in addition to the video taken by Parker's dashboard camera, Spence's dashboard camera captured video from this point on, from the opposite angle.

Returning to the moments after Parker put Patel's hands behind his back, Patel attested that while that was happening, Patel did not move.  Parker restrained both

of Patel's hands continuously, according to Patel, and the officers searched both Patel's pockets.

Parker did not agree with Patel's recollection. According to Parker, Patel pulled his left hand free four times. Then, Parker recounted, he tried to pat down one of Patel's pockets, but he was not able to do so because Patel was pulling away. Parker also asserted that after he had Patel's hands behind Patel's back, Patel stepped forward, turned his head back towards the officers, and moved his shoulder.

A review of the video footage does little to resolve the dispute concerning whether Patel pulled his hands away from his back, since the officers' bodies blocked one camera's view of Patel's hands during this time, and the other camera's recording is very grainy and distant.[3] As a result, it is impossible to observe forceful wrenching, let alone movements, by Patel. But the video does show that after Parker put Patel's hands behind his back, Parker appeared to frisk Patel's right leg, from the pocket to the shoe.

Then Parker commanded, "Do not jerk away from me again. If you do, I am going to put you on the ground. Do not jerk away from me one more time. Do you understand? Do you understand what I'm saying to you? Do not jerk away from

---

[3] In addition to viewing the Parker and Spence Videos, we have viewed Patel's clips of those videos at quarter-speed and with added zoom. While those are helpful, they do not change the factual picture painted by the regular dashboard-camera pictures.

7

me." Patel did not respond, and movement by Patel is not visible on the video recordings.

Parker next appeared to pat down Patel's left pants pocket for a few seconds. As for Patel's alleged step forward, immediately after Parker apparently frisked Patel's left pocket, the video footage shows that Patel did not take a step forward but rather, in what could be construed as a move to maintain his balance, adjusted his foot what looks like at most an inch to the side. Finally, when the video is slowed down to quarter-speed, the only detectable movement beyond this appears to be that Patel turned his head halfway towards Parker and Spence as Spence arrived in his cruiser.

Immediately after this, Parker took Patel to the ground, using his left leg to sweep Patel's left leg out from under him, even though Parker admitted he did not know how to perform a leg sweep. As Patel's legs flew up and back behind him and his shoe flew off, Patel recalled, Parker continued to hold Patel's hands behind Patel's back. As a result, Patel hit the ground hard, face and left shoulder first.

Soon after Patel was on the ground, Spence walked up to the scene. As Spence arrived, he thought Patel "appeared to be in his 70s."

With Patel on the ground, Parker got on his hands and knees on top of Patel, and yelled, "Stop trying to jerk away from me!" Patel, though, did not seem in the video footage to be jerking away from Parker. Rather, Spence observed that blood

8

ran from Patel's nose, and Patel "appeared to be out of it," "drool[ing]" with his head "lolled." As Spence approached, Parker or Slaughter said to him about Patel, "He don't speak a lick of English."

Then the officers tried to stand Patel up, but Patel had no control over his lower extremities. Parker radioed for back-up and said that Patel was an "older Indian male" who "doesn't speak English."

Patel was transported by ambulance to the hospital for treatment.

As a result of the takedown, Patel, who suffered from pre-existing severe multilevel degenerative conditions of the spine, was permanently partially paralyzed. At the time of the incident, Patel weighed about 115 pounds, and Parker weighed roughly 150 pounds.

Spence later testified that when arrived on the scene before the takedown, he did not see anything that would have caused him "to lay hands on . . . Patel."

**B.**

Patel later filed this civil lawsuit against Parker and the City. Using 42 U.S.C. § 1983 as the vehicle, he alleged claims for illegal seizure, unlawful search, and excessive force in violation of the Fourth and Fourteenth Amendments to the United States Constitution. And under Alabama law, he also asserted claims against Parker for illegal search, false arrest, battery, and excessive force.

9

Patel and the City agreed to bifurcate discovery, which had the effect of prioritizing discovery about whether Parker violated Patel's Fourth Amendment rights and delaying discovery into whether the City had a policy or custom of its police officers using excessive force against citizens.

Once the parties completed the first phase of discovery, they all sought summary judgment. Parker contended that he was entitled to federal and state-law immunity from all of Patel's claims, and the City argued that Patel failed to establish that Parker violated any of Patel's federal constitutional rights. Patel moved for summary judgment on the basis that the video recordings allegedly showed that he did not resist before Parker took him to the ground.

The district court denied the City's and Patel's motions altogether. But it granted in part and denied in part Parker's motion.

With respect to Parker's motion, the court determined Parker was entitled to qualified immunity on Patel's federal claim arising from Parker's stop and frisk. The court reasoned that Parker had "arguable reasonable suspicion" to stop Patel based on Maples's call, the prevalence of burglaries in the area, and the fact that Patel matched much of the description Maples gave.

But the court determined that Parker was not entitled to immunity on Patel's excessive-force claims under the Fourth Amendment because disputed issues of fact remained about whether Patel was resisting before Parker took him to the ground.

10

Specifically, the court found that the parties disputed three things that the video recordings could not resolve: whether Patel jerked his hands free from Parker, whether Patel's alleged resistance prevented Parker from handcuffing Patel, and whether Parker had finished his frisk before leg sweeping Patel. And if a jury decided these questions in Patel's favor, the district court concluded, Patel's right to be free from the use of excessive force in this case was clearly established.

For basically the same reasons the court ruled it could not grant summary judgment on Parker's qualified-immunity claim, it denied Parker state-law immunity from Patel's claims for assault and battery under Alabama law, since that defense was unavailable when the officer used more force than the situation warranted.

As for the City's motion for summary judgment, on the stop-and-frisk claim, the court noted that arguable reasonable suspicion was not a defense for the City. And because the City did not establish actual reasonable suspicion, the court concluded, the City was not entitled to summary judgment. With respect to the excessive-force claim, the district court denied the City's motion because of the same disputed issues of fact that it found existed on Patel's excessive-force claim against Parker.

Parker filed an interlocutory appeal of the district court's order as it denied him summary judgment. The City followed suit, filing a notice of appeal on the district court's denial of summary judgment as to it.

11

## II.

We review *de novo* the denial of an immunity defense. *McCullough v. Finley*, 907 F.3d 1324, 1330 (11th Cir. 2018). When that denial comes on a summary-judgment motion, summary judgment is not appropriate unless "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1312 (11th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)) (internal quotation marks omitted). "The mere existence of a scintilla of evidence" cannot suffice to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present enough evidence to allow a jury to reasonably find in its favor. *Id.*

Since this is an interlocutory appeal, we also *sua sponte* examine our appellate jurisdiction. *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union AFL–CIO–CLC v. Wise Alloys, LLC*, 807 F.3d 1258, 1266 (11th Cir. 2015). Our review of jurisdictional issues is *de novo*. *See id.*

## III.

We begin with jurisdiction. Generally, parties may not immediately appeal intermediate orders with which they disagree. Instead, they must usually await the lower court's final disposition of the case. *See Hudson v. Hall*, 231 F.3d 1289, 1293 (11th Cir. 2000). But as with just about every rule, exceptions exist. The one

12

applicable here allows interlocutory appeal of a district court's denial of qualified immunity, since where it applies, that defense entitles the holder to immunity from not just liability, but from the lawsuit altogether. *See id.*

We may also exercise pendent appellate jurisdiction to review orders that lack a valid interlocutory basis if they are "inextricably intertwined with an appealable decision . . . ." *Id.* at 1294 (internal quotation marks omitted). But we are wary of parties' attempts to "piggy-back" on permissible interlocutory appeals where the issue along for the ride is not tightly tied to the qualified-immunity appeal. *Leslie v. Hancock Cty. Bd. of Educ.*, 720 F.3d 1338, 1344–45 (11th Cir. 2013); *see also Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 49–50 (1995) ("[A] rule loosely allowing pendent appellate jurisdiction would encourage parties to parlay. . . collateral orders into multi-issue interlocutory appeal tickets.").

Parker's appeal of the district court's denial of qualified immunity is reviewable as of right. And we exercise our discretion to review the City's appeal of the district court's ruling on Patel's excessive-force claim, as that claim is inextricably bound up in Parker's appeal.[4]  Indeed, part of Parker's appeal turns on whether Parker's leg sweep constituted excessive force in violation of the Fourth Amendment, and the City's appeal depends entirely on that question.

---

[4] We previously dismissed the rest of the City's appeal, since the district court's denial of summary judgment on the search-and-seizure claims was not inextricably intertwined with Parker's appeal on the excessive-force claim.

**IV.**

Qualified immunity applies to police officers partly because the law recognizes that they do an important and necessary—but sometimes dangerous—job on the public's behalf. An officer's duties often require her to rely on imperfect information to make snap judgments that can sometimes be the difference between life and death. *See*, *e.g.*, *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). But those snap judgments must be reasonable to fall within qualified immunity's ambit. *See id.* at 396; *see also Saunders v. Duke*, 766 F.3d 1262, 1266 (11th Cir. 2014). So when we consider whether an officer is entitled to qualified immunity, we balance "the need to hold [officers] accountable when they exercise power irresponsibly and the need to shield [them] from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation and quotation marks omitted). But it does not extend to an officer who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (internal quotation marks omitted and alteration in original).

14

To invoke qualified immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority when the challenged action occurred. *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). The term "discretionary authority" "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted). Here, Parker satisfied this requirement, as he performed the takedown while on duty as a police officer conducting investigative functions.

Because Parker established that he was acting within the scope of his discretionary authority, the burden shifts to Patel to demonstrate that qualified immunity is inappropriate. *See id.* To do that, Patel must show two things. First, he must demonstrate that, when viewed in the light most favorable to him, a material question of fact exists about whether Parker violated Patel's constitutional right to be free from the use of excessive force. And second, he must show that his right was "clearly established . . . in light of the specific context of the case, not as a broad general proposition[,]" at the time of Parker's actions, so as to have provided fair notice to Parker that his actions violated Patel's rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson*, 555 U.S. 223; *Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016). For these purposes, clearly

15

established law consists of holdings of the Supreme Court, the Eleventh Circuit, or the highest court of Alabama, where the leg sweep occurred. *See Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821, 826 n.4 (11th Cir. 1997) (en banc).

We divide our analysis into three parts. In Section IV.A., we consider whether material issues of fact remain about whether Parker's takedown violated Patel's Fourth Amendment rights. Concluding that they do, we analyze in Section IV.B. whether, when we view the facts in the light most favorable to Patel, the law clearly forbade Parker's actions at the time he undertook them. And finally, in Section IV.C., we consider whether Alabama's immunity analog bars Patel's assault and battery claim.

## A. Genuine issues of material fact prevent us from determining whether Parker's use of force was unconstitutional

We measure excessive-force claims under the Fourth Amendment under an objective-reasonableness standard. *See Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (citing *Tennessee v. Garner*, 471 U.S. 1 (1985) and *Graham*, 490 U.S. 386). That standard requires us to ask "whether the officer's conduct [wa]s objectively reasonable in light of the facts confronting the officer." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). In making this determination, we must be careful not to Monday-morning quarterback but instead to judge "[t]he 'reasonableness' of a particular use of force . . . from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396.

16

When an officer permissibly makes an arrest or investigatory stop, he may use "some degree of physical coercion or threat thereof to effect it." *Id*. To determine whether an officer's force was unreasonable, the Supreme Court has directed that we consider (1) the severity of the crime; (2) whether the individual "pose[d] an immediate threat to the safety of the officers or others"; and (3) whether the individual "actively resist[ed] arrest or attempt[ed] to evade arrest by flight." *Graham*, 490 U.S. at 396. We have also considered (4) the need for force to be applied; (5) the amount of force applied in light of the nature of the need; and (6) the severity of the injury. *Lee*, 284 F.3d at 1197–98 (citations omitted); *see also Sebastian v. Ortiz*, 918 F.3d 1301, 1308 (11th Cir. 2019).

But in a case where an officer uses "gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands," *Sebastian*, 918 F.3d at 1308 (citation and quotation marks omitted), "we have repeatedly ruled that the officer violates the Fourth Amendment and is denied qualified immunity," *id*. (cleaned up). *See*, *e.g.*, *Stephens v. DeGiovanni*, 852 F.3d 1298, 1326 (11th Cir. 2017) (no qualified immunity where "forceful chest blows" and "throwing [Stephens] against the car-door jamb" were "unnecessary for a compliant, nonaggressive arrestee"); *Lee*, 284 F.3d at 1198 (police officer used excessive force when he slammed the plaintiff's head onto the hood of her car while she was handcuffed, not posing a threat to the officer, and not posing a flight risk); *Slicker*

17

*v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (officers' force was excessive where they kicked a handcuffed and non-resisting defendant in the ribs and beat his head on the ground).

Construing the facts in the light most favorable to Patel and relying, as we must, on his version of the encounter where it is not contradicted by the video recording, we conclude that a jury could reasonably find that Patel was not resisting when Parker forcefully took him to the ground and that Parker's force was both gratuitous and excessive.

Under Patel's version of the facts, Patel never did anything suspicious; he was merely walking leisurely down the sidewalk when the officers encountered him. Patel did not speak or understand much English, and the officers recognized this fact. So when they gave him commands, they could not have reasonably anticipated that he would understand them. Yet Patel did his best to cooperate with the officers and obey their commands, pointing to his residence, stating its address, and trying to show them where it was as he walked in its direction.

When Parker took hold of Patel, under this version of the facts, Patel made no movements of resistance. Nor did he otherwise interfere with Parker when Parker frisked both his pockets. But upon Patel's minor adjustment of his foot, Parker nonetheless applied great force in a manner that all but ensured that Patel's head

18

would break both of their falls, since Parker was holding Patel's hands behind his back at the time.

Because a jury could reasonably find that Patel was not resisting, it could reasonably conclude that Parker "had no reason to use the force he did on [Patel] that resulted in severe and permanent physical injuries . . . ." *DeGiovanni*, 852 F.3d at 1326; *see id.* ("Under Stephens's version of the events at the time of his encounter with Deputy DeGiovanni, he had complied with all Deputy DeGiovanni's investigation questions and was not resisting or attempting to flee.").

Parker and the City make several arguments to escape the conclusion that a reasonable jury could reach these findings, based on the evidence on the summary-judgment record. None is persuasive.

First, Parker and the City argue that our precedent prohibiting the use of gratuitous and excessive force against non-resisting suspects applies only when the suspect is handcuffed. They are mistaken. As we expressly recognized in *DeGiovanni*, "While [most of] these cases involve plaintiffs who were handcuffed after their arrest before excessive force was used by the officer, the same rationale applies to the use of gratuitous force when the excessive force is applied prior to the handcuffing . . . ." *See DeGiovanni*, 852 F.3d at 1328 n.33.

Second, Parker and the City assert that a reasonable officer could have construed Patel's minor foot adjustment and the turn of his head as resistance. But

19

even if we assume that it was reasonable for Parker to interpret Patel's slight movements as resistance or flight, those "minor transgression[s] do[] not mean that the force allegedly used was a constitutionally permissible response, or that [Parker is] entitled to qualified immunity." *Saunders*, 766 F.3d at 1269 (finding that the officer's force was unjustified even if the plaintiff had "disobeyed an order by lifting his head off the hot pavement"). Proportionality is preeminent in the excessive-force context, and a reasonable jury could conclude that the swift and decisive force Parker employed was drastically in excess of what Patel's minor movements warranted. *Id.*; *see also Lee*, 284 F.3d at 1197 ("In order to determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand.") (citation and internal quotation marks omitted).

Third, Parker and the City contend that Patel's previous "flight" from the officers justified the use of force. In this respect, the defendants refer to Patel's few steps away from the officers during their interaction with him as "flight." But a reasonable jury could find that no reasonable officer could view Patel's limited steps as "flight" under the circumstances. And even if a reasonable jury could reach the opposite conclusion, it could nonetheless determine that Patel's minimal alleged evasiveness in this regard could not suffice to justify the use of force where Patel later completely submitted.

20

We have upheld the denial of qualified immunity in similar circumstances.  In *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997), for example, an officer approached Smith because he matched the description provided by a tipster.  *Id.* at 1417.  As the officer neared Smith, Smith raised a baseball bat in a threatening way and then dropped the bat and fled.  *Id.* at 1418.  A short chase ensued, but Smith "docilely submitted to arrest" when an officer ordered him to "get down."  *Id.*  Once Smith was on the ground, the officer put his knee into Smith's back, pulled Smith's arm behind his back to apply handcuffs, "and then with a grunt and a blow . . . [the officer] broke Smith's arm."  *Id.*  We held that the officer was not entitled to qualified immunity because the "broken arm was obviously unnecessary to restrain" Smith when he "was offering no resistance at all."  *Id.* at 1420.  In doing so, we reasoned that "even a previously fractious arrestee" did not justify "the considerable effort and force inferable from the [officer's] grunt" because at the time that grunt was uttered and the force used, Smith was "docile."  *Id.*

The facts here are even more compelling than in *Smith*.  Unlike in *Smith*, Patel did not menace the officers or lead them on an extended chase.  Instead, he took a total of about twenty slow and non-consecutive steps away from the officers.  Similar to the "grunt and blow" the officer delivered to the plaintiff in *Smith*, breaking his arm, Parker's leg sweep was so forceful that it knocked Patel's shoe off and caused permanent partial paralysis.  And viewing the facts in the light most favorable to

21

Patel, the leg sweep was "obviously unnecessary" because Patel did not resist at all. *Id.* So even if the previous steps Patel took towards home and away from the officers reasonably gave the officers the impression that Patel was evading them, Patel was not being "fractious" at the time Parker took him to the ground. And a reasonable jury could conclude it was unnecessary for Parker to forcefully throw Patel down.

Finally, Parker and the City argue that Parker's leg sweep amounted to only nonactionable *de minimis* force. *See Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000). They rely on *Nolin*, *Croom v. Balkwill*, 645 F.3d 1240 (11th Cir. 2011), and *Jones v. City of Dothan, Ala.*, 121 F.3d 1456 (11th Cir. 1997), for support. All are distinguishable.

In *Nolin*, the plaintiff alleged that the officer grabbed him from behind by the shoulder and wrist, threw him against a van, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable way, and handcuffed him. 207 F.3d at 1255. Nolin claimed he suffered bruising as a result but conceded that the bruises quickly disappeared, and he did not seek medical treatment. *Id.* The *Nolin* officer's actions were far less forceful than (and thus *de minimis* in comparison to) Parker's takedown of Patel, a fact that comparing the injuries of both incidents emphasizes. Whereas Nolin's bruises vanished shortly after the incident and he did not seek medical treatment, Patel could not walk away from the scene, had to be transported to the hospital by ambulance, spent ten days in

the hospital, had to have surgery, and then had to be transferred to a rehabilitation center.

The plaintiff in *Croom* asserted that an officer pushed her from a squatting position to the ground and held her there with a foot or knee for up to ten minutes. 645 F.3d at 1245. Though the plaintiff averred she had medical problems as a result, *Croom* does not identify what those alleged problems were. The *Croom* officer's actions in pushing the *Croom* plaintiff from a squatting position were far less aggressive than (and thus *de minimis* in comparison to) the swift and decisive force Parker employed to take down Patel. Plus, while the *Croom* plaintiff suffered resulting medical problems, the record does not suggest that they even began to rival the permanent partial paralysis that Patel endured.

As for *Jones*, the plaintiff there complained that the officers "slammed" him "against a wall, kicked his legs apart, required him to put his arms above his head, and pulled his wallet from his pants pocket," tearing his pants and scattering the contents of the wallet on the ground in the process. 121 F.3d at 1458. Three days after the incident, the *Jones* plaintiff obtained "minor medical treatment" for pain in his arthritic knee. *Id.* at 1460. As in *Nolin* and *Croom*, the officers' actions in *Jones* were far less forceful than Parker's, as a comparison of the *Jones* plaintiff's injury and Patel's permanent partial paralysis highlights. In short, these cases do not help Parker because, as a comparison to the facts of these cases shows, Parker did not use

23

*de minimis* force when he threw Patel to the ground without so much as Patel's hands free to break the fall.

Nor, as Parker and the City argue, does the fact that officers use leg sweeps regularly and that, in some case, a leg sweep might constitute *de minimis* force alter the analysis. Not only does this argument fail to account for the fact that Parker conceded that he did not know how to execute a leg sweep when he took Patel down, but it also does not consider the manner in which Parker executed his leg sweep.

For instance, in *Sebastian*, the officer contended that the *de minimis* exception shielded him from suit because he had merely handcuffed the plaintiff, something that officers do every day. 918 F.3d at 1308. We thought differently. *Id.* at 1309. While we recognized that handcuffing ordinarily constitutes *de minimis* force, in *Sebastian*, we concluded the handcuffing there exceeded *de minimis* force, since the officer applied the cuffs very tightly around the plaintiff's wrists for over five hours, causing the plaintiff to suffer nerve damage. *Id.* ("Lieutenant Ortiz effectively argues that handcuffing alone can never constitute excessive force, regardless of the need for the use of force under the circumstances or the extent of the injuries inflicted, which is a proposition that this Court has never endorsed."). Ultimately, we concluded that "[t]he seriousness and permanence of [the plaintiff's] injuries takes his claim out of the *de minimis* category." *Id.*

Here, the "seriousness and permanence" of Patel's injuries and the unusual alacrity and horsepower of Parker's leg sweep preclude Parker's force from being characterized as *de minimis*.[5]    *See*, *e.g.*, *DeGiovanni*, 852 F.3d at 1327 ("[T]he amount of force used by Deputy DeGiovanni in arresting Stephens, which caused his severe and permanent injuries, documented by treating physicians, forecloses any *de minimis* argument by Deputy DeGiovanni."). As a result, qualified immunity on this basis is unwarranted.

**B. The law had clearly established that Parker's force was unconstitutional**

Next, we turn to whether, under the circumstances as construed in the light most favorable to Patel, the law clearly barred Parker from applying the force he did. We have explained that to meet this standard, a plaintiff must demonstrate that precedent "developed in such a concrete and factually defined context" made it "obvious to all reasonable government actors, in the defendant's place, that what he

---

[5] It is undisputed that Patel's pre-existing condition multiplied the harm to Patel. But Defendants fail to point to a single case where a court discounted the extent of the injuries simply because the plaintiff was more susceptible to greater injury. *Cf. Sebastian v. Ortiz*, 918 F.3d 1301, 1309 (11th Cir. 2019) ("If an officer, for instance, needlessly handcuffed an injured driver who crashed his vehicle while speeding and seriously aggravated the injuries caused by the accident, the fact that the officer harmed the driver by 'merely' applying handcuffs would not necessarily bar an excessive force claim."). Instead, we have said that the "human skull is a relatively hearty vessel for the brain, but it will generally not fare well in a contest with hardened" ground, and when an officer uses "extreme force" to bring the skull into contact with the ground, he can expect that a multitude of injuries will reverberate from that collision. *See Saunders v. Duke*, 766 F.3d 1262, 1269 (11th Cir. 2014). Because Patel's injuries were significant, severe, and will be felt for a lifetime—even after discounting the pre-existing condition—Patel has established enough to survive summary judgment.

[was] doing violate[d] federal law." *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000) (citation and quotation marks omitted).

A plaintiff may establish that the law clearly established that a particular amount of force was excessive in any of three ways. First, a plaintiff may "point to a materially similar case [that has] already decided that what the police officer was doing was unlawful." *Lee*, 284 F.3d at 1198 (citation and quotation marks omitted and alteration in original). Second, if the plaintiff cannot find a materially similar factual case from the Supreme Court, our Court, or, in this case, the Supreme Court of Alabama, a plaintiff can "show that a broader, clearly established principle should control the novel facts in this situation." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). Third, a plaintiff may rely on the "obvious clarity" path, which applies when "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw." *Priester*, 208 F.3d at 926 (citation and quotation marks omitted). Under this test, the law is clearly established and qualified immunity can be overcome only if the standards set forth in relevant precedent "inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." *Id.* at 926–27 (citation and quotation marks omitted). Whatever the method a plaintiff employs to prove that the law was clearly established, we are, at bottom, concerned with ensuring that any officer must

have had fair notice, at the time he engaged in his actions, that his challenged conduct amounted to excessive force. *See Sebastian*, 918 F.3d at 1311.

Here, both the second and third methods lead to the conclusion that, under Patel's version of the facts, the law was clearly established that Parker's takedown of Patel violated Patel's right to be free from the use of excessive force.

Starting with the second method, "[w]e have repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Saunders*, 766 F.3d at 1265 (collecting cases). Indeed, our cases establishing this principle date to at least 2000. *See id.* If a jury believes Patel's version of the facts—under which Patel was not resisting and was complying with the officers' commands when Parker executed the swift and decisive leg sweep—it could reasonably find that Parker knowingly violated this principle when he threw Patel to the ground.

The third method of demonstrating that a right was clearly established also applies here. Indeed, we have previously concluded that employing gratuitous force against a docile suspect can meet the "obvious clarity" test. For instance, in *DeGiovanni,* we held that the officer's use of gratuitous force on a suspect who was not resisting presented "obvious-clarity facts" that rendered "particularized preexisting case law" irrelevant. 852 F.3d at 1328 (citation and quotation marks

27

omitted); *see also Sebastian*, 918 F.3d at 1311–12*; Priester*, 208 F.3d at 927 (finding that where the suspect offered no resistance, "[n]o reasonable police officer could believe that this force was permissible given these straightforward circumstances").

Here, when we credit Patel's side of the story, no reasonable officer could have thought that sweeping Patel's legs out from under him and throwing him to the ground headfirst was a reasonable use of force. Patel was somewhat frail and was not resisting or attempting to flee, so the law clearly forbade Parker's forceful takedown under the circumstances.

## C. Parker is not entitled to immunity under Alabama law

Parker separately contends that Alabama's immunity doctrine shields him from Patel's state-law assault and battery claims. Alabama's "[s]tate-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002). The Alabama Supreme Court has adopted a burden-shifting framework for deciding whether state-agent immunity applies. *Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006); *see also Hill v. Cundiff*, 797 F.3d 948, 980–81 (11th Cir. 2015) (describing Alabama's burden shifting framework).

Under this framework, the officer first must demonstrate that the plaintiff's claims "arise from a function that would entitle [the officer] to immunity." *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003). Here, Patel has

28

conceded that Parker was acting in such a function, so Patel must shoulder the burden of showing that Parker "act[ed] willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Ex parte Cranman*, 792 So. 2d 392, 402 n.13 (Ala. 2000). Alabama law also withholds immunity "when the Constitution or laws of the United States . . . require otherwise." *Id.* at 405.

We have found Alabama's state-agent immunity to be inapplicable where the plaintiff has demonstrated that the officer used "gratuitous[]" force in derogation of the Fourth Amendment. *See*, *e.g.*, *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 742 (11th Cir. 2010). In *Brown*, we held that the officer was not entitled to Alabama's state-agent immunity where the officer used pepper spray and other force against the plaintiff "intentionally, gratuitously, and in violation of [the plaintiff's] clearly established constitutional rights." *Id.* We further concluded that the officer's use of gratuitous force when the plaintiff was not resisting supported an inference that the officer's conduct was willful. *See id.*

We are bound by *Brown*'s sound reasoning, and it applies squarely to this case. Similar to the non-resisting plaintiff in *Brown*, Patel has shown that in the light most favorable to him, Parker employed great force, even though Patel was not resisting. That suffices to support an inference that Parker engaged in willful assault

and battery.  For that reason, Parker is not entitled to state-law immunity at this stage of the proceedings.

## V.

In sum, the district court did not err in denying summary judgment to Parker and the City.  Neither we nor the dashboard-camera video recordings can resolve the parties' factual discrepancies about whether Patel was resisting before Parker took him to the ground.  For these reasons, we affirm in all respects the district court's denial of summary judgment.

**AFFIRMED.**