RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0288p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

S. BAXTER JONES,

  *Plaintiff-Appellant*,

*v.*

CITY OF DETROIT, MICHIGAN; REUBEN FLUKER; ROBIN
CLEAVER; EDWARD HUDSON; ELVIN BARREN,

  *Defendants-Appellees*.

> No. 21-1055

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:17-cv-11744—Avern Cohn, District Judge.

Argued:  November 2, 2021

Decided and Filed:  December 21, 2021

Before:  SUTTON, Chief Judge; MOORE and GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Kathryn Bruner James, GOODMAN HURWITZ & JAMES, P.C., Detroit, Michigan, for Appellant.  Cheryl L. Ronk, CITY OF DETROIT, Detroit, Michigan, for Appellees.  **ON BRIEF:**  Kathryn Bruner James, GOODMAN HURWITZ & JAMES, P.C., Detroit, Michigan, for Appellant.  Cheryl L. Ronk, CITY OF DETROIT, Detroit, Michigan, for Appellees.

  SUTTON, C.J., delivered the opinion of the court in which GRIFFIN, J., joined. MOORE, J. (pp. 10–16), delivered a separate dissenting opinion.

---

**OPINION**

---

SUTTON, Chief Judge.  After police arrested Baxter Jones during a protest in Detroit, he sued the City on several grounds, including a claim that the police officers failed to provide a reasonable accommodation for him when they took him to the police station.  Officers transported Jones, who uses a wheelchair, in a cargo van.  That was unsafe and injured him, he alleged in the complaint.  The district court dismissed his claim that the City was vicariously liable for the officers' failure to accommodate him.  Because vicarious liability is not available for claims under Title II of the Americans with Disabilities Act, we affirm.

I.

In 2014, officers with the Detroit Police Department arrested Baxter Jones and eight other individuals as they demonstrated outside a city water contractor's facility.  The protestors blocked the building's entrance, and the officers arrested them for disorderly conduct.  A police bus came to take the protestors to a police station, but Jones could not board it because he uses a wheelchair, which the bus was not equipped to handle.  The officers called for a cargo van to transport him.

According to Jones, the vehicle was not up to the task.  Because the van did not have a wheelchair lift, the officers had to lift him into the van.  The interior of the van, he claims, also created problems, as the height of the ceiling made it difficult for him to sit up straight.  And the van lacked restraints.  To keep the wheelchair from rolling around while the van was in transit, an officer sat in the back with Jones and braced his feet against the chair's wheels to prevent it from moving.  Jones claims that the entry into the van and the jostling and bouncing of the ensuing trip exacerbated existing injuries and damaged his spine.

The State of Michigan declined to prosecute Jones for disorderly conduct, but that did not end the dispute.  Jones filed a lawsuit against the City of Detroit.  In addition to the City, he named a number of police officers in their individual capacities.  He brought claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; the Rehabilitation Act, 29 U.S.C.

§ 701 *et seq.*; and state law, Mich. Comp. Laws § 37.1101 *et seq.*  He also filed a claim under § 1983, arguing that the officers used excessive force in violation of the Fourth Amendment.

The defendants moved for summary judgment.  The district court denied their request for qualified immunity on the excessive-force claim, which prompted an interlocutory appeal.  Our court reversed and granted qualified immunity to the officers with respect to the excessive-force claims against them.  *Jones v. City of Detroit*, 815 F. App'x 995, 1000 (6th Cir. 2020).

The district court separately granted summary judgment in the City's favor on Jones's failure-to-accommodate claims under the Americans with Disabilities Act and the Rehabilitation Act.  The court held that neither statute permits a claim of vicarious liability, the theory under which Jones sued the City.  Jones asked the district court to certify that question for interlocutory appeal.  It did, and we granted permission to appeal.

## II.

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  A Title II plaintiff may bring a claim for intentional discrimination or for failure to provide a reasonable accommodation.  *Roell v. Hamilton County*, 870 F.3d 471, 488 (6th Cir. 2017).

When it comes to remedies for a violation, Title II borrows from the Rehabilitation Act. It says that the "remedies, procedures, and rights" under section 505 of the Rehabilitation Act apply to Title II claims.  42 U.S.C. § 12133.  Section 505 of the Rehabilitation Act, as it happens, is a borrower too.  It says that the "remedies, procedures, and rights set forth" in Title VI of the 1964 Civil Rights Act "shall be available" for violations of the Rehabilitation Act.  29 U.S.C. § 794a(a).  The upshot?  The remedies available for violations of Title II of the ADA and § 505 of the Rehabilitation Act are "coextensive" with those for Title VI, *Barnes v. Gorman*, 536 U.S. 181, 185 (2002), and to borrow from the district court operate like one "matryoshka doll" within another, *Jones v. City of Detroit*, Case No. 17-11744, 2019 WL 2355377, at *5 (E.D. Mich. June 4, 2019).

That prelude sets the table for establishing that Title VI tells us whether vicarious liability is available under these provisions of the ADA and Rehabilitation Act.  Whether an injured party may seek relief premised on vicarious liability turns on the nature of the "remedies, procedures, and rights" available or, in the words of the Supreme Court, on a construction of "the scope of available remedies" under the statute.  *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 284–85 (1998); *see Barnes*, 536 U.S. at 187.

*Hiler v. Brown* confirms the point.  177 F.3d 542 (6th Cir. 1999).  It evaluated whether an employee may sue a supervisor in his individual capacity in a retaliation claim under the Rehabilitation Act.  *Id.* at 543.  The relevant portion of the Rehabilitation Act at issue in that case incorporated Title VII's remedies in the same way that Title II incorporates Title VI's remedies. *Id.* at 545.  There, we looked to Title VII to determine whether a claimant could sue a supervisor personally under the Rehabilitation Act.  *Id.*  Here, we do the same.  Whether Title II imposes vicarious liability rises and falls with whether Title VI does.

In answering the Title VI question, we have considerable guidance.  Title II of the ADA is not the only federal civil rights statute that incorporates the remedies established by Title VI of the Civil Rights Act.  Title IX of the Education Amendments of 1972 uses the same remedial scheme, *compare* 42 U.S.C. §§ 2000d-1, 2000d-2, *with* 20 U.S.C. §§ 1682, 1683; *see also Cannon v. Univ. of Chi.*, 441 U.S. 677, 695–96 (1979), and the Supreme Court to our fortune has already investigated the availability of vicarious liability under Title IX.

In *Gebser*, the Court faced a claim by a student who became embroiled in a sexual relationship with a teacher and who sued her school district for sexual harassment under Title IX. 524 U.S. at 277–78.  The student did not have any evidence that other school officials knew about the teacher's misconduct, however.  *Id.* at 291.  Absent actual notice and deliberate indifference on the part of district officials with the authority to intervene, the Court held that the student did not have a claim for monetary damages.  *Id.* at 292–93.

Three features of Title IX undergirded the Court's decision.  The first was its date of enactment.  At Title IX's birth in 1972, most civil rights laws did not permit money damages actions.  That was true even for "principal civil rights statutes" like Title VII, which created an

express cause of action. *Id.* at 285–86.  Title IX by contrast has only an implied cause of action. *See Cannon*, 441 U.S. at 717.  Under these statutory circumstances, the Court thought it hard to believe that Congress would implicitly authorize damages awards under Title IX at a time when it had not done so under Title VII, which contained an express cause of action. *Gebser*, 524 U.S. at 285–86.

The second feature was Title IX's "contractual nature" as Spending Clause legislation. *Id.* at 287.  When Congress invokes its Spending Clause powers and imposes conditions on the States for the receipt of federal funds, it reasoned, a recipient must have notice that noncompliance could open the door for liability in damages. *Id.*  No such notice appeared in the words of the statute.  A school district would justifiably be surprised to learn that, by accepting federal funds, it could be subjected to a monetary judgment mentioned nowhere in the statute due to conduct school officials knew nothing about—and even at a dollar amount exceeding the initial grant. *Id.* at 289–90.  It was "sensible to assume" from this statutory silence, the Court explained, that Congress "did not envision" money-damages liability. *Id.* at 287–88.

The third feature was the enforcement scheme that Title IX lays out.  While the statute does not expressly create a private cause of action, it does expressly create administrative enforcement remedies. *Id.* at 288.  The key recourse is that federal agencies may file actions against noncompliant recipients of funds.  Before doing so, an agency must notify the "appropriate person" employed by the recipient and attempt to achieve compliance voluntarily. *Id.*; *see* 20 U.S.C. § 1682.  That reality offered one more clue to the Court.  "It would be unsound," the Court explained, "for a statute's *express* system of enforcement to require notice to the recipient and an opportunity to come into voluntary compliance while a judicially *implied* system of enforcement permits substantial liability without regard to the recipient's knowledge." *Gebser*, 524 U.S. at 289.

Title VI shares all of these features with Title IX.  It was enacted at a time when existing civil rights statutes containing express rights of action authorized private claims for injunctive and equitable relief, not monetary relief.  It invoked Congress's Spending Clause powers.  And it contained the same administrative enforcement mechanism, which requires actual notice to a recipient's officials. *Cannon*, 441 U.S. at 695–96, 696 n.18.

What was true for Title IX in *Gebser* is true for Title VI today.  Our court previously suggested as much in *Foster v. Michigan*, 573 F. App'x 377, 389 (6th Cir. 2014).  We indicated that the claimants "likely would not be able to establish Title VI liability . . . under a theory of respondeat superior." *Id.*  Noting that "the *Gebser* Court recognized that Title VI and Title IX operate in the same manner," *Foster* reasoned that "*Gebser*'s interpretation that there is no vicarious[] liability under Title IX supports the notion that there is no vicarious liability under Title VI." *Id.*

Several other circuits agree.  *See, e.g.*, *United States v. County of Maricopa*, 889 F.3d 648, 652 & n.2 (9th Cir. 2018) (explaining that "an entity cannot be held vicariously liable on a *respondeat superior* theory" under Title VI); *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664–65 (2d Cir. 2012) (explaining the limited circumstances in which "courts view actions of a third party as intentional violations by the funding recipient itself" under Title VI without discussing vicarious liability); *see also Rodgers v. Smith*, 842 F. App'x 929, 929 (5th Cir. 2021) (per curiam) ("Title VI allows neither personal liability claims against individuals nor vicarious liability claims against employers for the acts of their employees.").

Because Title II of the ADA and the Rehabilitation Act import Title VI's remedial regime, that ends the inquiry.  If Title VI does not allow vicarious liability, neither do these provisions of the ADA or the Rehabilitation Act.

Jones resists this approach and conclusion.

Two courts of appeals at first glance appear to have reached the opposite conclusion.  *See Delano-Pyle v. Victoria County*, 302 F.3d 567, 574–75 (5th Cir. 2002); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001).  But time and circumstances have not favored either decision.  The Fifth Circuit decision never addressed the impact of *Gebser* on this analysis. Twice since then, the Fifth Circuit has acknowledged the possibility that *Delano-Pyle* was wrong because it did not engage with *Gebser*.  In each instance, the court did not finally resolve the point. *Harrison v. Klein Ind. Sch. Dist.*, 856 F. App'x 480, 483 n.4 (5th Cir. 2021) (per curiam); *Plains Cap. Bank v. Keller Ind. Sch. Dist.*, 746 F. App'x 355, 361–62 (5th Cir. 2018) (per curiam).  The Ninth Circuit decision also did not grapple with *Gebser*.  It relied on in-circuit

precedent without pausing to ask whether that case, a decade older than *Gebser*, remained good law. *Duvall*, 260 F.3d at 1141 (citing *Bonner v. Lewis*, 857 F.2d 559, 566–67 (9th Cir. 1988)).

One more datapoint deserves note. More recently, the Fifth and Ninth Circuits have held that Title VI does not impose vicarious liability. *See County of Maricopa*, 889 F.3d at 652 & n.2; *Rodgers*, 842 F. App'x at 929. Each decision relied on *Gebser* in doing so. Each court of appeals, to be sure, has not taken the next step of addressing the impact of those decisions on the ADA's incorporation of Title VI. But at a minimum, serious tension exists between the earlier and later decisions.

That leaves one other court of appeals that has permitted vicarious-liability claims under Title II of the ADA. But that case was decided *before Gebser* and thus had no reason to consider the relationship between the Supreme Court's conclusions about Title IX and the ADA. *See Rosen v. Montgomery County*, 121 F.3d 154, 157 n.3 (4th Cir. 1997).

Other civil rights statutes, it is true, authorize some vicarious-liability claims. Title VII offers one example. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 72 (1986). But the "general rule" that vicarious liability applies as a background principle has force only "absent clear direction to the contrary by Congress." *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 70–71 (1992); *see also Vinson*, 477 U.S. at 72. Just that kind of "clear direction" appears here. Congress has explicitly said that a claimant seeking relief under Title II of the ADA must use the remedies provided by Title VI.

Jones claims that *Gebser*, even on its own terms, does not apply because, unlike the student there, he does not need to show intentional discrimination to prevail on his reasonable accommodation claim. But the statute offers no reason for treating this (or that) claim differently. In no uncertain terms, it says that the remedial framework for Title VI applies to Title II of the ADA, whether the claim turns on one state of mind or another or for that matter race or disability discrimination. No matter the theory of the violation under either statute, the target of the recovery must be the perpetrators themselves.

One other distinction between *Gebser* and this case exists. While Congress invoked its Spending Clause powers to enact Title IX and Title VI, *Barnes*, 536 U.S. at 189 n.3; *Gebser*, 524

U.S. at 287, it invoked § 5 of the Fourteenth Amendment to enact the ADA, 42 U.S.C. § 12101(b)(4). But the distinction makes no difference to the issue at hand. Congress is free to define the remedies available under any kind of legislation, whether enacted under § 5 of the Fourteenth Amendment, the Spending Clause, the Commerce Clause, or the Taxing Power. Where Congress does so, it overrides any default rule or background principle applicable to the remedies available. Confirming the point is the ADA itself. It creates customized remedies depending on the type of discrimination at issue and, in doing so, separately imports distinct remedial regimes. Title I and Title III of the ADA incorporate aspects of the enforcement regimes from Title VII and Title II of the 1964 Civil Rights Act. 42 U.S.C. § 12117(a); *id.* § 12188(a)(1). And Title II of the ADA incorporates remedies from the Rehabilitation Act, which in turn incorporates Title VI. All we do here is honor those choices. In the face of these express legislative policies, any concerns about the kinds of remedies available under different types of congressional power is "quite irrelevant." *Barnes*, 536 U.S. at 189 n.3.

III.

Our conclusion that vicarious liability does not apply to Title II of the ADA or § 505 of the Rehabilitation Act takes us to the end of the road for Jones's two failure-to-accommodate claims against the City. He brought only one version of that claim under each statute, and it was premised on vicarious liability.

Even so, Jones now contends that the record shows that the City was deliberately indifferent and that he can prevail even without using vicarious liability. But the claim comes too late. Jones made no mention of deliberate indifference in his complaint. He instead asserted that the City was vicariously liable for the acts of its police officers. The summary judgment papers did not address deliberate indifference. Indeed, in the hearing that followed, the district court specifically inquired about the theory behind Jones's failure-to-accommodate claim. The judge asked, "[W]hat directly did the City do in violation of [the] ADA for which the plaintiff is entitled to monetary damages?" And Jones's attorney responded, "The City was the employer of the individuals who failed to accommodate Mr. Jones' need for a reasonable accommodation." "So it's respondeat superior liability?" The judge clarified. "Correct," his attorney responded.

R.85 at 9.  It is too late to raise a different theory now.  *See United States v. Walker*, 615 F.3d 728, 733 (6th Cir. 2010).

We affirm.

———————————

**DISSENT**

———————————

KAREN NELSON MOORE, Circuit Judge, dissenting.  In alleging that officers in this case failed to accommodate his disability, Baxter Jones asserts a violation of Title II of the Americans with Disabilities Act (ADA) rather than a violation of Title VI or Title IX of the Civil Rights Act of 1964.  Unlike Title IX of the Civil Rights Act, which conditions the right to nondiscrimination on a receipt of federal funds, Title II of the ADA is an outright prohibition on discrimination.  On that ground, I would distinguish the Supreme Court's holding in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), and hold that vicarious liability is within the scope of the remedies envisioned by Title II of the ADA.

## I.  RESPONDEAT SUPERIOR LIABILITY

### A.  Agency principles and *Gebser*'s application

When interpreting a statute, courts presume that Congress legislates against the background of common-law principles.  *See e.g.*, *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1016 (2020); *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 347 (2013).  Following that general rule, the Supreme Court has long looked to principles of agency and tort law when analyzing remedial provisions of statutes intended to remedy discrimination.  *See Univ. of Texas Sw. Med. Ctr.*, 570 U.S. at 347; *Babb v. Wilkie*, 140 S. Ct. 1168, 1178 (2020); *Carey v. Piphus*, 435 U.S. 247, 254–55 (1978).  Respondeat superior, or vicarious liability, is a "basic agency principle[]" that the Court routinely uses for its interpretation of civil-rights statutes.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 791 (1998); *see also Meyer v. Holley*, 537 U.S. 280, 285 (2003) (applying vicarious liability principles to the Fair Housing Act); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 755 (1998) (relying on agency principles to hold employer vicariously liable under Title VII of the Civil Rights Act); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986) (looking to agency principles for guidance in interpreting Title VII).  Indeed, when a plaintiff seeks compensation for discrimination under a civil-rights statute, it is logical for courts to apply tort-based principles.

*See Meyer*, 537 U.S. at 287. "[A]bsent an indication to the contrary in the statute itself," we therefore presume that Congress assumed the availability of a respondeat superior theory in vindicating rights to be free from discrimination. *Univ. of Texas Sw. Med. Ctr.*, 570 U.S. at 347.

The majority interprets *Gebser* as an "indication to the contrary," holding that Congress has foreclosed the availability of respondeat superior under Title VI of the Civil Rights Act, and therefore Title II of the ADA. As the majority explains, *Gebser* looked at three data points to hold that respondeat superior liability is unavailable under Title IX of the Civil Rights Act. 524 U.S. at 287–88. Unlike the majority, I believe that all three of those points lead to the opposite conclusion with respect to Title II of the ADA.

*Gebser* first examined the time frame in which Title IX was passed. Because Title IX was enacted in 1972, a time when civil-rights statutes did not provide for recovery of monetary damages, the Supreme Court did not consider it appropriate to allow an "unlimited recovery" of damages from an employer. *Id.* at 285–86. Congress passed the ADA, however, in 1990, after the Supreme Court decided *Cannon v. University of Chicago*, 441 U.S. 677 (1979), which held that private persons may enforce Title IX through an implied right of action. Courts assume after *Cannon* that Congress legislated with the full backdrop of traditional remedies—which includes monetary damages—in mind. *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 70–72 (1992).

Second, the court in *Gebser* looked to "Title IX's contractual nature" to determine the scope of available remedies under the statute. 524 U.S. at 287. Because Title IX was passed under Congress's Spending Clause authority, the substance of the violation is essentially a breach of contract between an entity receiving federal funds and the U.S. government. *See* 20 U.S.C. § 1681 ("No person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity *receiving Federal financial assistance*." (emphasis added)). Without the receipt of federal funds, there could be no Title IX violation. Drawing from contract-law principles, the Supreme Court has held that when Congress passes a statute under its Spending Clause powers, it is unreasonable for an individual to recover damages from a public entity that was unaware that it was violating a contractual condition. *See Gebser,* 524 U.S. at 286–88; *see also Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

Congress passed Title II of the ADA, by contrast, under its authority to remedy Constitutional wrongs under § 5 of the Fourteenth Amendment.  *See* 42 U.S.C. § 12101(b)(4); *Tennessee v. Lane*, 541 U.S. 509, 533–34 (2004).  A substantive violation of Title II of the ADA is a violation regardless of whether the entity receives federal funds.  *See* 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.").  Title II of the ADA, like Title VII of the Civil Rights Act, is an "outright prohibition" on discrimination.  *Gebser*, 524 U.S. at 286.  To remedy the violation of a substantive right, as opposed to a condition of federal funding, an entity must compensate the plaintiff for the harms incurred by the discrimination itself, rather than harms incurred from a breach of contract as a third-party beneficiary.

Given that Congress defined the wrong at issue as the outright violation of a right, the principles underlying respondeat superior—to make sure an employer takes care properly to hire and train its employees to prevent harm—counsel its application here.  *See* Restatement (Third) of Agency § 2.04 cmt. b (Am. L. Inst. 2006).  As *Gebser* recognized, an outright prohibition "aims broadly to eradicate discrimination."  524 U.S. at 286 (internal citation omitted).  Respondeat superior liability helps to further that goal.  In that sense, Title II of the ADA aligns more closely with Title VII of the Civil Rights Act, which envisions vicarious liability.  *See Meritor*, 477 U.S. at 72; *cf. Gebser*, 524 U.S. at 286–87 (distinguishing Title IX from Title VII in support of the argument that vicarious relief is unavailable for Title IX claims).  Respondeat superior extends to tortious conduct committed by employees.  That principle extends naturally to discriminatory conduct as well.

Finally, *Gebser* pointed to Title IX's administrative regulations, which require the federal entity to notify a recipient of a violation before the federal authority revokes aid, as support for the unavailability of vicarious liability.  524 U.S. at 289.  Although the regulations implementing compliance with Title VI contain a similar provision, *see* 28 C.F.R. § 42.108, ADA regulations paint a different picture.  In the regulations governing compliance procedures under Title II of the ADA, a "designated agency" is directed to investigate complaints and must attempt to resolve the dispute informally.  28 CFR § 35.172(a), (c).  If informal resolution fails, then an

agency is directed to notify the public entity of its findings. *Id.* "At any time," however, "the complainant may file a private suit pursuant to section 203 of the act, 42 U.S.C. § 12133, whether or not the designated agency finds a violation." *Id.* § 35.172(d). That ADA regulations allow the complainant to file a lawsuit at any time—whether or not the public entity received notice of the violation—distinguishes the procedures under the ADA from Title IX's compliance provisions.

We must presume that general principles of agency, including respondeat superior, apply to our interpretation of the scope of the ADA unless we are faced with an indication to the contrary. Unlike the majority, I would hold that *Gebser*'s interpretation of Title IX of the Civil Rights Act does not alter that presumption with respect to Title II of the ADA.

**B. Respondeat superior and coextensive interpretation of Title VI and Title II**

The majority also holds that Congress's incorporation of Title VI into Title II's remedies provision is the kind of "clear direction" that forecloses claims pursued under a theory of vicarious liability. *Franklin*, 503 U.S. at 70. Because the "remedies, procedures, and rights set forth in" Title VI "shall be the remedies, procedures, and rights" Title II provides, if Title VI forecloses respondeat superior liability, the majority assumes that Title II must do so as well. 42 U.S.C. § 12133. But the majority misinterprets respondeat superior. Rooted in agency principles, "respondeat superior is a *basis* upon which the legal consequences of one person's acts may be attributed to another person." Restatement (Third) of Agency § 2.04 cmt. b (Am. L. Inst. 2006) (emphasis added). In other words, respondeat superior is a "doctrine holding an employer or principal liable for the employee's or agent's wrongful acts committed within the scope of the employment or agency." *Respondeat Superior*, Black's Law Dictionary (11th ed. 2019). A plaintiff could plausibly rely on different theories of liability to vindicate the same type of right even when the statutory underpinnings of the right are different.

To be sure, the kinds of "remedies, procedures, and rights" available under the Rehabilitation Act and Title VI must be the same *kinds* of remedies available under the ADA. *See* § 12133; *Barnes v. Gorman*, 536 U.S. 181, 185, 189–90 n.3 (2002). For that reason, the Supreme Court in *Barnes* examined Title VI's contractual nature and concluded that Title VI,

and therefore the ADA, do not permit recovery of punitive damages, regardless of the source of Congressional power. *Id.* at 189–90 n.3. Unlike punitive damages, however, respondeat superior is not a remedy. Nor is respondeat superior a right or procedure.

Respondeat superior is not a type of remedy but rather a *theory* of liability that affects the remedy's scope. *See Polk County v. Dodson,* 454 U.S. 312, 325 (1981) (referring to respondeat superior as a "theory of liability"); Dan B. Dobbs, Paul T. Hayden, and Ellen M. Bublick, *The Law of Torts* § 425 (2d ed. 2019) ("Vicarious liability is liability for the tort of another person."). In practice, then, respondeat superior affects how a plaintiff frames a case to the jury but does not change the relief a plaintiff is seeking ultimately. Respondeat superior may be part of a "remedial scheme" involved in effectuating the remedies available under the statute, *see Gebser*, 524 U.S. at 290, but the scheme is distinct from the remedy itself. No one disputes here that the same kinds of remedies, i.e., compensatory damages, are available under both Title II of the ADA and Title VI of the Civil Rights Act. *See Johnson v. City of Saline*, 151 F.3d 564, 574 (6th Cir. 1998) (holding that compensatory damages are available for violations of Title II of the ADA); *Doe v. BlueCross BlueShield of Tenn., Inc.,* 926 F.3d 235, 240 (6th Cir. 2019) (noting that compensatory damages are available under Title VI of the Civil Rights Act). Different theories of liability are available to effectuate the remedy under both statutes, but the same remedy, compensatory damages, is available.

Respondeat superior also does not create any substantive rights or delineate any procedures. The right protected under Title II is the same kind of right that Title VI protects: the right to be free from discrimination. *Compare* 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.") *with* 42 U.S.C. § 2000(d) ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."). And applying respondeat superior principles as a theory of liability does not affect the procedure of filing either a Title II or a Title VI lawsuit. Respondeat superior liability may affect *who* is liable but does not affect the "manner and means" by which

the right to be free from discrimination is enforced. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010).

The distinction between a theory of liability and a remedy, procedure, or right, moreover, is one Congress would understand. Because Congress is presumed to legislate against a backdrop of common-law principles, *Comcast*, 140 S. Ct. at 1016, Congress understood when drafting Title II of the ADA that employer liability under a respondeat superior theory is available generally when an employee violates an individual's rights. Congress also understood that Spending Clause legislation, unlike legislation enacted under § 5 of the Fourteenth Amendment, would require that states "knowingly and voluntarily" accept the terms of a contract and subsequently have notice when the terms of the contract were violated. *See Pennhurst*, 451 U.S. at 17. Congress could have chosen to predicate the existence of the substantive right on the receipt of federal funds, as in Title VI or Title IX of the Civil Rights Act. It did not do so in defining the statutory violation. We must honor that choice.

This case illustrates the importance of holding the City vicariously liable for the acts of its employees. At oral argument, counsel for the City pronounced that "a police officer going out into the streets and reacting to a scene is not something that a city can have control over." Oral Arg. 13:53–14:00. Maybe not in all circumstances, but a city can be careful about hiring officers sensitive to the needs of disabled persons and training its officers not to discriminate against them. The threat of respondeat superior liability would incentivize it to do so, and I would hold that a respondeat superior theory is available to plaintiffs.

## II. DIRECT LIABILITY

Because the scope of this interlocutory appeal is limited to whether the City could be held liable under a respondeat superior theory, we cannot decide now whether the City could be held directly liable for its failure to implement a policy that adequately accommodates persons who are disabled. I note only that Jones alleged in his amended complaint that "[a]s a direct and proximate result of Defendant City's unlawful actions, *through its own policies* and the actions of its employees and agents, Plaintiff has suffered damages." R. 32 (Am. Compl. ¶ 50) (Page ID #450) (emphasis added). I construe Jones's complaint as fairly encompassing a theory of direct

liability and disagree with the majority that Jones forfeited that claim. *See Shepherd v. Wellman*, 313 F.3d 963, 967 (6th Cir. 2002) (stating that the court "construe[s] the complaint liberally in the plaintiff's favor" in reviewing a district court's grant of summary judgment). Jones did raise his alternative theory of liability, moreover, in his motion to alter or amend the judgment—the soonest Jones could respond to the district court's grant of summary judgment on an issue that the City did not raise below. R. 60 (Mot. to Alter or Am. J. ¶ 3, 4–5) (Page ID #1330–31). The district court did not acknowledge Jones's direct-liability theory in ruling on the motion. I see no reason why the district court should not address those arguments as the case proceeds.