[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-11310

_____

KIRBY INGRAM,

Plaintiff-Appellant,

*versus*

LOUIS KUBIK,
BLAKE DORNING,
KEVIN TURNER,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 5:19-cv-00741-LCB

_____

Before WILLIAM PRYOR, Chief Judge, JORDAN, Circuit Judge, and BROWN,[*] District Judge.

WILLIAM PRYOR, Chief Judge:

Kirby Ingram appeals the dismissal of his complaint for failure to state a claim, FED. R. CIV. P. 12(b)(6), against a sheriff's deputy and his supervisor for unlawful seizure and excessive force, *see* 42 U.S.C. § 1983; U.S. CONST. amends. IV, XIV, and against the Sheriff for vicarious liability under Title II of the Americans with Disabilities Act, *see* 42 U.S.C. § 12132. Ingram, an Iraq War veteran, suffers from post-traumatic stress disorder. Two Sheriff's deputies conducted a welfare check after a report that Ingram slit his wrist with a knife. When the deputies arrived, Ingram was calm and posed no threat to them. Although Ingram expressed his willingness to be arrested, one of the deputies suddenly body slammed him headfirst, causing him a serious neck injury. We affirm the dismissal of Ingram's claim for unlawful seizure but reverse the dismissal of his claim of excessive force and supervisory liability. And "[b]ecause vicarious liability is not available for claims under Title II," *Jones v. City of Detroit*, 20 F.4th 1117, 1118 (6th Cir. 2021), we affirm the dismissal of that claim.

_____

[*] Honorable Michael L. Brown, United States District Judge for the Northern District of Georgia, sitting by designation.

## I. BACKGROUND

This appeal is from a dismissal of a complaint for failure to state a claim, *see* FED. R. CIV. P. 12(b)(6), so we recount the factual allegations in the complaint, accept them as true, and construe them in the light most favorable to Ingram, *see Darrisaw v. Pa. Higher Educ. Assistance Agency*, 949 F.3d 1302, 1303 (11th Cir. 2020).

Ingram is an Iraq War veteran who suffers from post-traumatic stress disorder. In October 2017, while suffering from a mental-health crisis, Ingram cut his wrist with a knife at his home. His girlfriend called the Veterans Affairs suicide hotline, which contacted law enforcement. Deputy Louis Kubik and another deputy from Madison County, Alabama, were dispatched to assist Ingram.

When the deputies arrived, Ingram was calm. The deputies searched him multiple times. They confiscated the knife with which Ingram had cut himself. After the search, the deputies knew that he was unarmed.

"Ingram assured the deputies [that] he was no longer suicidal" and "never expressed any desire to harm himself or any other person during his encounter with the deputies." He "insisted that the deputies either arrest him or leave." Both the deputies and Ingram's mother "tried to convince Ingram to let them take him to a residential program through . . . [Veterans Affairs] that Ingram's mother wanted him to attend." When Ingram asked the deputies if he was under arrest, the "deputies told [him] . . . that he was not."

Ingram reiterated "that he would cooperate with any arrest if that [was] what they wanted to do."

Because the deputies would not leave, Ingram left through the back door "on his third try." "Ingram ran into a cotton field behind the house, and the deputies followed." Ingram eventually stopped running and "let the deputies catch up to him." "The deputies told Ingram that if he would go back to his house and refuse medical treatment," the deputies would leave. "Ingram agreed to walk back to the house . . . and speak directly with [medical] personnel." As they walked back, Ingram stated "multiple times that if he was being arrested, the[ deputies] should . . . let him know and he would go voluntarily," but "[t]he deputies repeatedly told Ingram he was not under arrest."

When they reached the yard, "Ingram held his hands over his head and told [medical] personnel . . . that he was refusing medical treatment." The deputies knew that Ingram was unarmed and posed no threat to them. "Without warning, Kubik then grabbed Ingram under his armpits, picked Ingram up, and slammed Ingram to the ground head first, causing Ingram to suffer a serious neck injury." Ingram alleges that Kubik's decision to body slam "Ingram was motivated by hostility toward Ingram due to Ingram's mental illness." Ingram was taken to the hospital. "A surgeon removed Ingram's C-2 vertebra and replaced it with a metal rod. The surgeon also fused Ingram's C-3 and C-4 vertebrae."

"Despite widespread knowledge of th[is] incident up the chain of command" that included then-Sheriff Blake Dorning, "the

incident was not . . . investigated, and the deputy was not disciplined." Failure to investigate excessive force incidents "ha[d] been Dorning's standard operating procedure"; "[e]ven obviously-unconstitutional . . . actions of his deputies [were] immune from investigation and discipline." Ingram's lawyer learned from discovery in other lawsuits "that formal internal investigations of officer misconduct were not conducted," and after he requested "records of internal investigations of deputy misconduct," he was "told no such records existed." During Dorning's tenure, the Sheriff's website "identified no person or division to contact with a complaint [against] a deputy."

The complaint provides examples of excessive force that were allegedly not investigated. In one "well-publicized revenge beating," "Dorning refused to investigate and discipline the deputies involved," despite being "fully informed" of the incident, "including the revenge beating and cover-up." "Dorning learned that numerous deputies of various ranks were involved in the beating or its planning, in the cover-up, or in both." Despite that knowledge, and even though a policy and procedure manual required him to investigate, "Dorning took no action against any of the involved deputies" and "did not . . . initiate an internal affairs investigation." Dorning similarly "refused to investigate serious allegations related to [six] deaths at the Madison County Jail." And Ingram points to five other incidents that were "approved as a matter of routine through the chain of command without any investigation."

Dorning's inaction was "a matter of routine and de facto policy" of "approv[ing] the force used and never initiat[ing] further investigation." "Thus, no officer was disciplined, let alone terminated, for excessive force or for otherwise violating a citizen's constitutional rights during Dorning's 16-year tenure." As a result of that policy, "[d]eputies under Dorning's command learned that their justifications for using force and other unlawful actions would never be questioned and that they could act with impunity." Ingram alleges that "[t]hrough explicit instruction and long-established custom, Dorning established a custom or policy that incidents of possible, likely, or known misconduct were not investigated, with the foreseeable result that deputies like Kubik believed they could get away with violating Ingram's rights." Kubik believed that "he would not have to face any investigation and that he could act with impunity."

Ingram filed a civil-rights action, *see* 42 U.S.C. § 1983, against Kubik and Dorning in their individual capacities, for an unlawful seizure and the use of excessive force in violation of Ingram's constitutional rights, *see* U.S. CONST. amends. IV, XIV. Ingram also sued the current Sherriff, Kevin Turner, in his official capacity, for violating section 504 of the Rehabilitation Act, *see* 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act, *see* 42 U.S.C. § 12132. Ingram alleged that he "suffered from impairments that substantially limited one or more of his major life activities" and that he "had a disability within the meaning of" both Acts. He also alleged that "the Madison County Sheriff, through

the actions of his officers, failed to accommodate Ingram, a disabled person, and discriminated against him by seizing and assaulting Ingram." Later in the litigation, Ingram voluntarily dismissed his claim under section 504 and proceeded against Turner only under Title II.

After Dorning, Kubik, and Turner moved to dismiss the claims against them, the district court granted their motions. The district court held that there was no unlawful seizure because Kubik had probable cause to seize Ingram. On the excessive-force claim, the district court held that Kubik was entitled to qualified immunity because Ingram "ha[d] not shown that his constitutional right was clearly established at the time of the seizure," so there was "no need to decide if his constitutional right was violated." The district court held that Ingram had "failed to plausibly establish a causal connection between" Dorning's actions and the alleged excessive force to which Ingram was subjected. The district court reasoned that the examples of misconduct alleged in the complaint "at best indicate isolated events of alleged wrongdoing and do not suffice to indicate a 'custom or policy' in the department." And the district court held that Ingram's Title II claim against Turner requires that he allege "deliberate indifference"; that deliberate indifference requires having "actual knowledge of discrimination in the entity's programs and fail[ing] adequately to respond," *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019) (alteration adopted); and that Ingram "failed to allege that Turner had any actual knowledge of discrimination against people with

disabilities in his department." The district court did not decide whether Title II applies to police encounters or whether vicarious liability is available under Title II; it mentioned only that these questions have not been settled by this Court.

## II. STANDARDS OF REVIEW

We review *de novo* an order dismissing a complaint. *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). We review *de novo* determinations that officers are entitled to qualified immunity. *See Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir. 2019).

## III. DISCUSSION

We divide our discussion in two parts. First, we explain that Kubik and Dorning are entitled to qualified immunity from Ingram's claim of an unlawful seizure but not from his claim of excessive force and supervisory liability. Second, we explain that Ingram's claim against Turner fails because vicarious liability is unavailable under Title II.

### A. Kubik and Dorning Are Entitled to Qualified Immunity from Ingram's Claim of Unlawful Seizure But Not from His Claim of Excessive Force and Supervisory Liability.

A complaint must be dismissed if its factual allegations, on their face, establish an affirmative defense that bars recovery. *See Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003). If a defendant advances the affirmative defense of qualified immunity, the district court must dismiss any claims that fail to allege a violation of clearly established law. *See id.* Officers asserting qualified-

immunity defenses have the burden to establish that they were acting within their discretionary authority. *Piazza*, 923 F.3d at 951. If the officers satisfy that burden, the burden then shifts to the plaintiff to establish that the officers violated a constitutional right that was clearly established at the time of the alleged violation. *Id.* The officers are entitled to qualified immunity if the plaintiff fails to show either that there was some constitutional violation or that it was clearly established, and we may consider these two elements in either order. *Id.*

We divide this part in three subsections. First, we conclude that Kubik could lawfully seize Ingram because there was probable cause that Ingram was a danger to himself. Second, we conclude that the force Kubik used against Ingram during that otherwise lawful seizure was unconstitutionally excessive based on clearly established law. Finally, we conclude that the complaint states a claim of supervisory liability against Dorning for the violation of Ingram's clearly established right to be free from excessive force.

### 1. Kubik Had Probable Cause to Seize Ingram.

Ingram does not dispute that Kubik was acting within his discretionary authority. So, Ingram must establish that Kubik seized him in violation of his clearly established rights. *See id.* Ingram cannot satisfy that burden.

"The Fourth Amendment protects people from unreasonable . . . seizures." *Roberts v. Spielman*, 643 F.3d 899, 905 (11th Cir. 2011). Mental-health seizures are reasonable under the Fourth

Amendment when the officer has probable cause to believe that the seized person is a danger to himself or to others. *Id.* "[T]he correct legal standard to evaluate whether an officer had probable cause to seize a suspect is to ask whether a reasonable officer could conclude that there was a substantial chance," *see Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022) (alteration adopted) (internal quotation marks omitted), "of dangerous behavior," *Roberts*, 643 F.3d at 906 (internal quotation marks omitted).

Kubik had probable cause to believe that Ingram was a danger to himself. "Deputy [Kubik] was dispatched in response to a 911 call for a possible suicide attempt." *Id.* By the time Kubik arrived, Ingram had cut his wrist with a knife. Ingram's mother thought the situation perilous enough to warrant taking Ingram "to a residential program through . . . [Veterans Affairs]." And Ingram exhibited erratic behavior when he sought to evade the deputies and isolate himself in a cotton field.

In the light of those facts, Kubik was not required to believe Ingram's innocent assurances that he no longer desired to harm himself. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018). Kubik "could have disbelieved" Ingram because "people normally do not" attempt to kill themselves by cutting their wrist if they lack a serious desire to do so. *Cf. id.* at 587. And Ingram's argument that Kubik was "motivated by anger" is irrelevant because "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "[I]t was objectively

reasonable for [Kubik] to believe that [Ingram] might still be in need of immediate aid even though" he was not actively trying to kill himself, *see Roberts*, 643 F.3d at 905, because he had recently attempted to do just that. Because Kubik had probable cause to seize Ingram, Kubik and Dorning are entitled to dismissal of the unlawful-seizure claim. *See Piazza*, 923 F.3d at 951.

## 2. Kubik is Not Entitled to Qualified Immunity from the Claim for Excessive Force.

Although Kubik could lawfully seize Ingram, the way he allegedly did so was excessive. "A citizen's Fourth Amendment right to be free from unreasonable . . . seizures includes the right to be free from the use of excessive force in the course of an arrest." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1326 (11th Cir. 2015) (internal quotation marks omitted). But "[t]o deny qualified immunity at the motion to dismiss stage, we must conclude both that the allegations in the complaint . . . establish a constitutional violation *and* that the constitutional violation was clearly established." *Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019) (internal quotation marks omitted). We conclude that both requirements are satisfied.

A determination that an officer used excessive force "requires careful attention to the facts and circumstances of each particular case" while "recogniz[ing] that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. We apply the "*Graham* framework" to mental health seizures even

though they "do[] not involve a criminal arrest." *Mercado v. City of Orlando*, 407 F.3d 1152, 1157–58 (11th Cir. 2005). Under that framework, the force used by an officer is reasonable only if it is "reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer [or others], and the risk of flight." *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002); *see also Graham*, 490 U.S. at 396. "This Court also considers the need for application of force, the relationship between the need and amount of force used, and the extent of the injury inflicted by the arresting officer." *Helm v. Rainbow City*, 989 F.3d 1265, 1273 (11th Cir. 2021) (citing *Lee*, 284 F.3d at 1198 & n.7).

Kubik argues that body slamming Ingram was justified because it "had the immediate effect of immobilizing him using non-lethal force and preventing any further threat from [Ingram], either to himself or to the officers." Kubik also asserts that he "took advantage of an opportunity to physically detain [Ingram]—a former soldier experiencing a mental health crisis who had tried to commit suicide—after he had stopped running and the officers had caught up to him." And Kubik maintains that he did not violate Ingram's rights because of Ingram's "aberrant and erratic conduct." We disagree.

"All of the factors articulated in *Graham* weigh in favor of [Ingram]." *Mercado*, 407 F.3d at 1157. Although Kubik implies that "the use of force [was] justified because suicidal subjects sometimes make erratic moves that can jeopardize the safety of the officers," "viewing the [alleged] facts in the light most favorable to [Ingram],"

there is "no indication that [Ingram] made any threatening moves toward the police." *Id.* The deputies had searched Ingram and confiscated the knife with which he had cut himself, so they knew he was unarmed. Before Kubik body slammed him, Ingram had his hands over his head. And there was no sign that he sought to flee when he was seized. Accepting these allegations as true, Ingram "was not actively resisting arrest, and there is no [allegation] that he struggled with the police" at the time of the seizure. *Id.* Although Kubik could lawfully seize Ingram, the "extent of the injury [he] inflicted" was significant enough to confirm the already tenuous nature of the relationship between the "need for application of force" and the "amount of force used." *See Helm*, 989 F.3d at 1273.

We conclude that the force used was not "reasonably proportionate to the need for that force." *Lee*, 284 F.3d at 1198. "Because [Ingram] was not committing a crime, resisting arrest, or posing an immediate threat to the officers at the time he was [body slammed]," Kubik "used excessive force when apprehending [Ingram]." *Mercado*, 407 F.3d at 1157–58. So, Ingram has satisfied his burden to show that "the officer violated a constitutional right." *Piazza*, 923 F.3d at 951.

Ingram can establish that "the right was clearly established at the time of the alleged violation," *id.*, "in any of three ways," *see Patel v. City of Madison*, 959 F.3d 1330, 1343 (11th Cir. 2020). First, he can "point to a materially similar case that has already decided that what the police officer was doing was unlawful." *Patel*, 959 F.3d at 1343 (alteration adopted) (internal quotation marks

omitted). Second, if he "cannot find a materially similar factual case from the Supreme Court, our Court, or, in this case, the Supreme Court of Alabama," Ingram can establish "that a broader, clearly established principle should control the novel facts in this situation." *Id.* (internal quotation marks omitted). Third, Ingram can establish that the officer's "conduct [was] so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the [officer], notwithstanding the lack of caselaw." *Id.* (internal quotation marks omitted). We conclude "that a broader, clearly established principle" controls here. *See id.* (internal quotation marks omitted).

Our precedents "hold that gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008); *see also id.* (holding that an officer "was not entitled to use *any* force" after handcuffing a suspect because the suspect "neither resisted arrest nor posed a danger" to the officer (emphasis added)). We have held that police officers cannot employ gratuitous and seriously injurious force against non-resisting suspects who are under control. *See, e.g.*, *Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014) ("We have repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands."); *Lee*, 284 F.3d at 1200 (relying on "the clear and obvious principle that once an arrest has been fully secured and any potential danger or risk of flight vitiated,

a police officer cannot employ . . . severe and unnecessary force"). And we have explained that "the same rationale applies to the use of gratuitous force when the excessive force is applied prior to the handcuffing but in the course of the investigation." See Stephens v. DeGiovanni, 852 F.3d 1298, 1328 & n.33 (11th Cir. 2017); see also Patel, 959 F.3d at 1340 (citing DeGiovanni, 852 F.3d at 1328 n.33) (rejecting the "argu[ment] that our precedent prohibiting the use of gratuitous and excessive force against non-resisting suspects applies only when the suspect is handcuffed"). Based on precedents that preceded Kubik's conduct, we have explained that "our case law is clear that serious and substantial injuries caused during a suspect's arrest when a suspect is neither resisting an officer's commands nor posing a risk of flight may substantiate an excessive force claim." Sebastian, 918 F.3d at 1310–11 (examining case law from 1997 to 2017); see also Patel, 959 F.3d at 1343 ("[O]ur cases establishing this principle date to at least 2000.").

Smith v. Mattox, 127 F.3d 1416 (11th Cir. 1997), is instructive. There, "a police officer subjected a previously threatening and fleeing arrestee to nondeadly force after the arrestee suddenly became docile." Id. at 1419. The suspect had "raised [a] baseball bat in a threatening posture" before the officer drew his firearm and "ordered [the suspect] to drop the bat." Id. at 1418. The suspect then dropped the bat and ran from the officer, who pursued him. Id. When the officer caught up, the suspect "docilely submitted to arrest upon [the officer's] request for him to 'get down.'" Id. The officer then put his knee on the suspect's lower back and, "with a

grunt and a blow," broke the suspect's arm while trying to handcuff him. *Id.* Because the suspect "was offering no resistance *at all*, the considerable . . . force inferable from the grunt, [the suspect's] sensation of a blow, and the broken arm was obviously unnecessary to restrain even a previously fractious arrestee," so we concluded "that this case falls within the slender category of cases in which the unlawfulness of the conduct is readily apparent even without clarifying caselaw." *Id.* at 1420. "*Smith* established that if an arrestee demonstrates compliance, but the officer nonetheless inflicts gratuitous and substantial injury using ordinary arrest tactics, then the officer may have used excessive force" even if the arrestee "was initially recalcitrant and even acted aggressively toward the officer." *Sebastian*, 918 F.3d at 1311.

*Mercado v. City of Orlando*, 407 F.3d at 1154–58, is also instructive. There, officers were called to conduct a welfare check on a suicidal subject who had "wrapped a telephone cord around his neck" and "used a . . . knife to make multiple cuts on his arms." *Id.* at 1154. When the officers arrived, the subject's wife told the officers that he "was armed with a knife and had threatened to commit suicide." *Id.* The officers found the subject "sitting on the kitchen floor" while "holding the knife in both hands and pointing it toward his heart." *Id.* The officers ordered him to "drop his knife at least two times," "but he refused without making any threatening moves toward the officers." *Id.* Within 30 seconds of giving that order and with no warning, an officer shot the subject in his head with a rubber projectile, "resulting in brain injuries." *Id.* at 1154–

55, 1155 n.3. After applying the *Graham* factors, we held that the use of force was excessive. *Id.* at 1157–58.

The facts that made the force used in *Mercado* excessive obtain here. In *Mercado*, we rejected "[t]he defendants['] claim that the use of force [was] justified because suicidal subjects sometimes make erratic moves that can jeopardize the safety of the officers on the scene." *Id.* at 1157. Despite the subject's being armed and not under control, we reasoned that there was "no indication that [the subject] made any threatening moves toward the police," and that he "was not actively resisting arrest," "struggl[ing] with the police," or "posing an immediate threat to [them]" before an officer used seriously injurious, lethal force. *Id.* at 1157–58. Most of these facts were true of Ingram. But unlike the subject in *Mercado*, Ingram behaved less erratically, was compliant, was not an immediate threat to himself or to the deputies, and was known to be unarmed.

Our precedents clearly established that Kubik could not use grossly disproportionate, gratuitous, and seriously injurious force against a non-resisting, compliant, and docile subject like Ingram. Ingram was unarmed. He posed no threat to Kubik. He had his hands over his head. And he reiterated that he would cooperate with any arrest. When Kubik body slammed Ingram headfirst without warning and caused a severe neck injury, that force was "utterly disproportionate to the level of force reasonably necessary" in that circumstance. *See Oliver v. Fiorino*, 586 F.3d 898, 908 (11th Cir. 2009).

To be sure, Ingram behaved erratically when he ran into the cotton field. But using seriously injurious force against "even a previously fractious arrestee" is unlawful if at the time of arrest he "was offering no resistance *at all*." *Smith*, 127 F.3d at 1420; *see also Mercado*, 407 F.3d at 1157. And it is of no moment that Ingram was not yet under physical control in that circumstance. *See DeGiovanni*, 852 F.3d at 1328 n.33. Kubik's headfirst body slam was a "gratuitous use of force" against someone who was "not resisting arrest" that our precedents have established "constitutes excessive force." *Hadley*, 526 F.3d at 1330. We conclude that "our case law bars [Kubik's] alleged actions with sufficient clarity to put any reasonable officer on notice" that the use of seriously injurious force against a compliant, docile, non-resisting, and unarmed subject like Ingram "constituted excessive force." *Sebastian*, 918 F.3d at 1311. Kubik is not entitled to qualified immunity based on these allegations.

### 3. Dorning is Not Entitled to Qualified Immunity from Ingram's Claim of Supervisory Liability.

Supervisory officials are not vicariously liable under section 1983 for the unconstitutional acts of their subordinates. *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). Plaintiffs must instead allege that the supervisor, through his own actions, violated the Constitution. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Because Ingram does not allege that Dorning was present or involved in the altercation, Dorning is liable under section 1983 only if "there is a causal connection between [his] actions . . . and the alleged

constitutional deprivation." *Hartley*, 193 F.3d at 1269 (internal quotation marks omitted).

Causation "may be established and supervisory liability imposed where the supervisor's improper custom or policy results in deliberate indifference to constitutional rights." *Id.* (alterations adopted) (internal quotation marks omitted). "A plaintiff can also show that the *absence* of a policy led to a violation of constitutional rights." *Piazza*, 923 F.3d at 957. "Either way, though, to prove that a policy or its absence caused a constitutional harm, a plaintiff must point to multiple incidents, or multiple reports of prior misconduct by a particular employee." *Id.* (citation omitted). And allegations of a single incident of unconstitutional conduct cannot state a claim for supervisory liability, even when the conduct involves several subordinates. *Id.* at 957–58.

Dorning makes two arguments. First, he argues that the allegations fail to state a claim for supervisory liability. Second, he argues that he is entitled to qualified immunity. We disagree with both arguments.

"A plaintiff survives a motion to dismiss only if his complaint alleges 'sufficient factual matter, accepted as true, that states a claim to relief that is plausible on its face.'" *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) (alterations adopted) (quoting *Iqbal*, 556 U.S. at 678). After ignoring conclusory allegations, "we assume any remaining factual allegations are true and determine whether those factual allegations 'plausibly give rise to an

entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). We conclude that Ingram's complaint states a claim against Dorning.

Ingram's complaint alleges that there was a causal connection between Dorning's conduct and the excessive force used against Ingram. The complaint alleges that Dorning established a policy that "incidents of possible, likely, or known misconduct were not investigated, with the foreseeable result that deputies like Kubik believed they could get away with violating Ingram's rights." *Cf. Hartley*, 193 F.3d at 1269 (finding relevant the lack of evidence that a supervisor "had any sort of policy in place prior to the [alleged misconduct] which could have led [the subordinate] to believe that [the misconduct] was permitted by [the supervisor]"). And Ingram's complaint alleges that Kubik had that belief when he used excessive force.

The complaint alleges "multiple incidents, or multiple reports of prior misconduct by" officers, *Piazza*, 923 F.3d at 957 (citation omitted), that were not investigated by Dorning. One incident involved a "well-publicized revenge beating" that "Dorning refused to investigate" and in which he did not "discipline [the] deputies involved," despite being "fully informed" of the beating and cover-up. Dorning knew that "numerous deputies of various ranks were involved in the beating" or its cover-up. Dorning allegedly took no action against any of the deputies involved and "did not . . . initiate an internal affairs investigation." The complaint identifies five other incidents that were "approved as a matter of routine through the chain of command without any investigation." In one

of these incidents, "a deputy with a history of losing his temper with citizens punched a severely intoxicated misdemeanor arrestee twice in the face, causing an orbital fracture."

Dorning allegedly "was copied on all use of force reports" and "approved of the excessive uses of force without having any of them investigated." "[N]o officer was disciplined, let alone terminated, for excessive force or for otherwise violating a citizen's constitutional rights during Dorning's 16-year tenure." During that tenure, Dorning's website "identified no person or division to contact with a complaint [against] a deputy." In response to requests for "records of internal investigations of deputy misconduct," Ingram's lawyer was "told no such records existed," despite a "policy and procedure manual" that "requires thorough and prompt investigations" of allegations of misconduct. And "[d]espite widespread knowledge of the incident" involving Kubik and Ingram "up the chain of command (including Dorning)[,] . . . the incident was not . . . investigated."

Contrary to Dorning's argument, this case is not like *McCullough v. Finley*, where "we struggle[d] to find [any] factual allegations" in a complaint that alleged only "the [officials'] names and titles." 907 F.3d at 1334–35. In *McCullough*, there was "nothing about the significance of [the officials'] titles, their individual roles in the [policy], their personal interactions or familiarity with [the plaintiffs], their length of service, their management policies, or any other characteristics that would bear on whether they knew

about the [policy] that they allegedly operated." *Id.* at 1334 (internal quotation marks omitted).

The allegations of "multiple reports of prior misconduct," *Piazza*, 923 F.3d at 957, with no investigation by Dorning "allow[] the court to draw the reasonable inference," *Iqbal*, 556 U.S. at 678, that there is a causal connection between Dorning's failure to investigate any allegations of serious misconduct and Kubik's belief that he could act with impunity. The factual allegations, if true, establish the "*absence* of a policy" of investigating excessive force violations, *see Piazza*, 923 F.3d at 957, of which Dorning had knowledge, *see Rivas v. Freeman*, 940 F.2d 1491, 1495–96 (11th Cir. 1991) ("[T]he district court's findings regarding [the] Sheriff['s] . . . failure to establish policies and procedures [were] supported" by "evidence at trial which established that [he] knew of prior instances of [misconduct], but allowed his deputies to [engage in that misconduct]."). And the complaint relies on more than the incident at issue to establish the custom or policy. *See, e.g.*, *Piazza*, 923 F.3d at 957–58.

Dorning also is not entitled to qualified immunity. Because Ingram does not dispute that Dorning was acting within the scope of his discretionary authority, "the burden shifts to [Ingram] to show that (1) [Dorning] violated a constitutional right and (2) the right was clearly established at the time of the alleged violation." *Id.* at 951. Ingram has satisfied his burden.

A supervisor can be held liable for implementing or failing to implement a policy that causes his subordinates to believe that

they can permissibly violate another's constitutional rights if the subordinates then do so based on that belief. *See Hartley*, 193 F.3d at 1269. As we have explained, the complaint adequately alleges that one of Dorning's subordinates used excessive force and that there is a causal connection between that excessive force and Dorning's policy of allowing such force. And this Court has clearly established that "a custom of allowing the use of excessive force . . . provides the requisite fault[,] . . . as a persistent failure to take disciplinary action against officers can give rise to the inference that a [supervisor] has ratified conduct." *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985). That "allegation would [also] provide the causal link between the challenged conduct and the . . . policy, because [the officer] would have been acting in accordance with the policy of allowing or encouraging excessive force." *Id.* This principle applies both to municipalities and supervisors "responsible for disciplining police officers and setting police department policy." *Id.* It follows that Ingram's complaint states a claim that Dorning violated his clearly established constitutional rights.

## B. *Vicarious Liability is Unavailable under Title II of the Americans with Disabilities Act.*

Under Title II of the Americans with Disabilities Act, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Given the textual similarities between" Title II and section 504 of

the Rehabilitation Act, 29 U.S.C. § 794(a), "the same standards govern claims under both, and we rely on cases construing Title II and [section] 504 interchangeably." *Silberman*, 927 F.3d at 1133 (alterations adopted) (internal quotation marks omitted). To state a claim under Title II, Ingram had to allege "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of [his] disability." *Id.* at 1134 (internal quotation marks omitted).

Ingram seeks compensatory damages for the alleged Title II violation. And "[t]o get damages—as [Ingram] seeks here—a plaintiff must clear an additional hurdle: he must prove that the entity that he has sued engaged in intentional discrimination, which requires a showing of deliberate indifference." *Id.* (internal quotation marks omitted). To recover from Turner under this standard, Ingram must establish that Turner is "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the entity's behalf" and "had actual knowledge of discrimination in the entity's programs and failed adequately to respond." *Id.* (alterations adopted) (internal quotation marks omitted).

The district court applied the deliberate-indifference standard, held that Ingram "failed to allege that Turner had any actual knowledge of discrimination against people with disabilities in his

20-11310                Opinion of the Court                25

department," and concluded that Ingram "failed to state a claim for relief." But Ingram seeks to evade that conclusion by arguing that Turner is vicariously liable. And we have explained that "the availability of respondeat superior for Title II . . . claims remains an open question." *Id.* at 1134 n.6.

Turner argues that vicarious liability is unavailable under Title II and that, in any event, Title II does not apply to police encounters. The latter argument may conflict with precedent. *See Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1084–85 (11th Cir. 2007) (explaining that a plaintiff can "attempt to show a[] . . . claim under . . . Title II" by establishing "that he was 'subjected to discrimination' by a public entity, *the police*, by reason of his disability" (quoting 42 U.S.C. § 12132) (emphasis added)). But we need not address that argument because we conclude that vicarious liability is unavailable under Title II.

The Supreme Court "ha[s] never decided whether" a public "entity can be held vicariously liable [under Title II] for money damages for the purposeful or deliberately indifferent conduct of its employees." *City of San Francisco v. Sheehan*, 575 U.S. 600, 610 (2015). And the courts of appeals are divided. Some have held that vicarious liability is available under Title II. *E.g.*, *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001); *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574–75 (5th Cir. 2002); *Rosen v. Montgomery Cnty.*, 121 F.3d 154, 157 n.3 (4th Cir. 1997). The Sixth Circuit recently held the opposite. *Jones*, 20 F.4th at 1118. We agree with the Sixth Circuit.

Although Title II "prohibits discrimination against the disabled by public entities[, and section] 504 of the Rehabilitation Act prohibits discrimination against the disabled by recipients of federal funding, including private organizations," *Barnes v. Gorman*, 536 U.S. 181, 184–85 (2002), both provisions incorporate the remedies available under other anti-discrimination statutes. The enforcement provision of Title II declares that "[t]he remedies, procedures, and rights set forth in [the Rehabilitation Act] shall be the remedies, procedures, and rights" Title II "provides to any person alleging discrimination on the basis of disability." 42 U.S.C. § 12133. And the enforcement provision of section 504 declares that the "remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act . . . under section [504]." 29 U.S.C. § 794a(a)(2). It follows that the remedies, procedures, and rights "for violations of [Title II] and [section] 504 . . . are coextensive with" those that are "available in a private cause of action brought under Title VI of the Civil Rights Act of 1964, which prohibits racial discrimination in federally funded programs and activities." *See Barnes*, 536 U.S. at 185 (citation omitted). So, "Title VI tells us whether vicarious liability is available under" Title II; if vicarious liability is unavailable under Title VI, it is unavailable under Title II. *Jones*, 20 F.4th at 1119.

Vicarious liability is unavailable under Title VI. *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), controls that question. In *Gebser*, the Supreme Court explained that

Title IX "was modeled after Title VI of the Civil Rights Act of 1964, which is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs." *Id.* at 286 (citations omitted). "The two statutes operate in the same manner . . . ." *Id.* The Court held that Title IX does not "permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of *respondeat superior* or constructive notice." *Id.* at 285. The Court reasoned that both Title VI and IX "attach[] conditions to the award of federal funds," *id.* at 287, under Congress's spending power, U.S. CONST. art. I, § 8, cl. 1. The "contractual nature [of those statutes] has implications for our construction of the scope of available remedies." *Gebser*, 524 U.S. at 287. The "central concern" for courts is with ensuring that the entity receiving funds has "notice" that it will be liable for noncompliance with the condition. *Id.* (internal quotation marks omitted). And "[i]f a school district's liability for a teacher's sexual harassment rests on principles of constructive notice or *respondeat superior*, it will . . . be the case that the recipient of funds was unaware of the discrimination," a result "that Congress did not envision." *Id.* at 287–88. Instead, "in cases . . . that do not involve official policy of the recipient entity," the Supreme Court "h[eld] that a damages remedy will not lie . . . unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of [the] discrimination . . . and fails to adequately respond," *id.* at 290—the standard the district court applied in this case.

Title IX, like Title II, "incorporates the remedies established by Title VI of the Civil Rights Act" and "uses the same remedial scheme." *Jones*, 20 F.4th at 1120. "[T]he [Supreme] Court has interpreted Title IX consistently with Title VI." *Barnes*, 536 U.S. at 185. And Title VI "shares all of the[] features" on which the Supreme Court relied to hold that vicarious liability is unavailable under Title IX, so "[w]hat was true for Title IX in *Gebser* is true for Title VI today." *Jones*, 20 F.4th at 1121. Because vicarious liability is unavailable under Title IX, *Gebser*, 524 U.S. at 285, "an entity cannot be held vicariously liable on a *respondeat superior* theory . . . under Title VI," *United States v. Cnty. of Maricopa*, 889 F.3d 648, 652 (9th Cir. 2018). And "[b]ecause Title II . . . and the Rehabilitation Act import Title VI's remedial regime," vicarious liability is unavailable under Title II. *Jones*, 20 F.4th at 1121.

Ingram agreed to the dismissal of his Rehabilitation Act claim under section 504 because "*Gebser* . . . provides support for the position that there is not vicarious liability under [section] 504." He decided to "proceed [instead] only under Title II." But we have repeatedly explained that "the same standards govern claims under both, and we rely on cases construing Title II and [section] 504 interchangeably." *Silberman*, 927 F.3d at 1133 (alterations adopted) (internal quotation marks omitted).

Ingram's attempt to find daylight between them is unavailing. Ingram asserts that section 504 and Title IX "appl[y] only to recipients of federal financial assistance" and correctly explains that they "ha[ve] a similar remedial scheme." But, he argues, "Title II

. . . [is] not linked to acceptance of federal funds." The problem for Ingram is that his argument was foreclosed by the Supreme Court in *Barnes v. Gorman*, 536 U.S. at 189–90 n.3.

In *Barnes*, the Supreme Court rejected the argument that "Title VI does not carry over to the [Americans with Disabilities Act] because the latter is not Spending Clause legislation." *Id.* at 189 n.3. The Court held that the provisions of Title II that expressly incorporate the remedies in the Rehabilitation Act "make discussion of the [Americans with Disability Act]'s status as a 'non Spending Clause' tort statute quite irrelevant." *Id.* at 190 n.3. Although Title II is not Spending Clause legislation, its text expressly incorporates the remedies available under a statute that is—Title VI.

We conclude that "*Gebser* provides the correct standard" under Title II. *See Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 349 (11th Cir. 2012). Under Title II, vicarious liability is unavailable; instead, the "narrower approach [in *Gebser*] . . . requires the deliberate indifference of an *official* who at a minimum has *authority* to address the alleged discrimination and to institute corrective measures on the [entity's] behalf and who has *actual knowledge* of discrimination in the [entity's] programs and fails adequately to respond." *See id.* (alteration adopted) (internal quotation marks omitted).

The district court applied that standard, and it correctly dismissed Ingram's Title II claim. As the district court concluded, Ingram "failed to allege that Turner had any actual knowledge of discrimination against people with disabilities in his department."

## IV. CONCLUSION

We **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings.